**C.T.S.C. BOSTON, INC.,
Plaintiff–Appellant,**

**v.**

**CONTINENTAL INSURANCE CO., Defendant–Appellee.**

**No. 00–1693.**

United States Court of Appeals, Sixth Circuit.

Dec. 26, 2001.

Before MOORE and COLE, Circuit Judges.*

---

* The Honorable John Corbett O'Meara. United States District Judge for the Eastern District of Michigan, was present at oral argument but did not take part in the consideration or decision of the case.

## OPINION

MOORE, Circuit Judge.

In this diversity case, Plaintiff–Appellant C.T.S.C. Boston, Inc. ("CTSC") appeals the district court's granting of summary judgment to Defendant–Appellee Continental Insurance Co. ("Continental"). After Continental denied CTSC's claim for the replacement cost of fifty-seven laptop computers that CTSC alleges were stolen from its Burlington. Massachusetts facility, CTSC, a Michigan corporation with its principal place of business in Michigan, filed suit in Michigan state court. Continental, an Illinois corporation with its principal place of business in Illinois, removed the case to federal court. Continental then moved for summary judgment, arguing that its denial of CTSC's claim was based on unambiguous language in the insurance policy excluding coverage for missing property when there is no physical evidence basis, concluding that CTSC discovered that the laptops in question were missing as the result of an inventory, which is specifically excluded from coverage under the policy language.

We **AFFIRM** the judgment of the district court because the policy limitation at issue is unambiguous and thus, under Michigan law, must be enforced. In sum, because CTSC is unable to present any physical evidence to explain what happened to the missing laptops, that loss is not covered by its policy with Continental.

## I. BACKGROUND

CTSC provides software training to individuals and corporate employees in the Boston, Massachusetts area. In September 1997, CTSC purchased the insurance policy at issue from Continental to insure its business property, including the laptop computers that it uses in its training activities. The actual extent of the coverage purchased is at the heart of the present dispute. The policy states:

## A. COVERAGE

We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

J.A. at 325. Section three of the property coverage describes "Covered Causes of Loss" in the following way:

3. Covered Causes of Loss

RISKS OF DIRECT PHYSICAL LOSS unless the loss is:

a. Excluded in Section **B., Exclusions;** or

b. Limited in paragraph **A.4., Limitations;** that follow.

J.A. at 326. Under paragraph four, "Limitations," the policy states, in relevant part: "We will not pay for loss of or damage to .... [p]roperty that is missing, but there is no physical evidence to show what happened to it, such as shortage disclosed on taking inventory." J.A. at 326.

On March 10, 1998, CTSC notified Continental that it had discovered the theft of fifty-seven laptop computers from its Burlington, Massachusetts facility. CTSC reported the theft to the police on the same date. Although CTSC states on appeal that it discovered this alleged theft on or about March 10, 1998, the record clearly indicates that the corporation's officers were aware that some laptops were missing well before this date. By February 28, 1998, these officers were aware that as many as thirty-seven laptops were missing, based on a count of the laptops at the Burlington facility. This count was conducted by James Christie, CTSC's controller, after Ronald Reame, the president of the corporation, instructed him to go to the Burlington facility and actually count the laptops. After further checking of invoices against laptops in the facility, CTSC officers concluded that fifty-seven laptops were missing.

The record is less clear, however, as to why this count was conducted in the first place. In his deposition, Reame claimed that he did not have "any particular reason" for having Christie conduct this count. J.A. at 392 (Reame Dep. at 24). Christie testified similarly:

> I didn't go out there on February 28th to uncover or to confirm I had missing computers. What happened is that . . . on the morning of February 28th . . . Mr. Reame came in and he said to me, Jim, go down to the laptop room and count the laptops. You want me to do that now, Ron, yes. I want it done today.

J.A. at 435 (Christie Dep. at 41). But Reame also stated that sometime around February 27, a CTSC employee at the Burlington facility told him that he believed laptops to be "missing." J.A. at 392–93 (Reame Dep. at 25–26). This appears to explain Reame's sudden and otherwise unexplained mandate to Christie to conduct the February 28 count.

The deposition testimony of Robert Zuliani, the secretary-treasurer of CTSC, however, indicates that, in the fall of 1997, CTSC was considering acquiring as many as 300 additional laptops and thus needed to know how many laptops it had. Zuliani testified that the discrepancy between the invoices and the laptops in CTSC's possession came to light as part of "an ongoing accounting for the fixed assets" of the company. J.A. at 412 (Zuliani Dep. at 22). He pointedly refused, however, to call this ongoing process an "inventory," stating: "Inventory is not the right word. The inventory is used for a retail item. We do not resell computers." J.A. at 412 (Zuliani Dep. at 22). As part of this ongoing process, Tim Bolton, who was the MIS manager at the Burlington facility, prepared a preliminary list of the laptops at the facility as early as September 1997, although this list did not indicate any missing equipment.[1]

After CTSC filed its insurance claim, its insurance agent filed a notice of loss on CTSC's behalf on May 8, 1998. Continental subsequently denied the claim, and CTSC filed suit in Michigan state court. CTSC's state complaint stated seven causes of action. Continental removed to federal court and, after discovery, moved for summary judgment. In its motion for summary judgment, Continental argued that judgment as a matter of law was appropriate because there was no dispute of material fact and its denial of CTSC's claim was based solely on the language of the insurance policy. Specifically, Continental argued that the shortage was discovered upon the taking of an inventory and was thus excluded from coverage by the clear language of the policy's missing property exclusion.[2]

---

1. Bolton was not deposed in the present case; he was fired on March 11, 1998, and CTSC is unaware of his current whereabouts. Similarly, the parties did not depose Brad Rinklin, the general manager of the Burlington facility until he, too, was fired on March 11, 1998. Although Rinklin and Bolton were fired because of the missing laptops, CTSC officers stated in their depositions that they do not believe that Rinklin and Bolton stole the missing computers. *See* J.A. at 416 (Zuliani Dep. at 40); J.A. at 437 (Christie Dep. at 46–47). If the missing computers had been stolen by CTSC employees, the insurance policy with Continental would not have covered the loss under an exclusion for losses due to employee theft.

2. In the alternative, Continental argued that CTSC's claim was limited to only $10,000, the amount specified in the policy extension for computer equipment defined by the policy as "hardware." J.A. at 305. CTSC countered that the policy extension limitation of covered losses of computer "hardware" to $10,000 did not apply because the missing laptops were not "hardware" under the definitions in the policy. *See* J.A. at 477. We need not reach this alternative argument and thus de-

In response to Continental's motion for summary judgment, CTSC voluntarily dismissed three of its seven counts, leaving its claims for breach of contract, breach of the implied covenant of good faith and fair dealing, violation of the Michigan Uniform Trade Practices Act, M.C.L. § § 500.2001 et seq., and bad faith. It asserted, moreover, that summary judgment was inappropriate given the ambiguity of the "physical evidence" clause of the policy, *see* J.A. at 472, and that it had stated a valid claim for violation of the Michigan Uniform Trade Practices Act, *see* J.A. at 477. CTSC's ambiguity argument was based in large part on the failure of the policy to define the term, "physical evidence," and New York cases holding similar language to be ambiguous.

The district court granted Continental summary judgment on all of CTSC's claims on May 15, 2000. With respect to the limitation at issue, the district court stated:

> Though CTSC's argument as to the ambiguity of the policy may be meritorious, the court need not decide that question here. Whatever the meaning of the general language may be, the policy section in question contains an example of a situation that would not be covered: "shortage disclosed on taking inventory." The evidence presented by the parties indicates that that is precisely the factual scenario presented here.

The record evidence indicates that in approximately September of 1997, CTSC decided to expand its business operations. In order to assess its laptop needs for that expansion, CTSC took an inventory of the laptops it had on hand. Zuliani Dep. at 28–29; Christie Dep. at 25–27. As the deposition testimony indicates, this initial inventory assessment set in motion a process whereby CTSC officials came to believe that a significant number of their laptops were unaccounted for, and an ongoing attempt was made through approximately March 10, 1998 to ascertain exactly what computers were in the company's possession. *See* Reame Dep. at 23–28, 30–33, 43, 48–50; Zuliani Dep. at 14–19, 21–26, 29, 34–39; Christie Dep. at 10–11, 25–39, 41–42, 45–47....

At base, in the course of taking an inventory of its assets, CTSC's officers came to believe that a substantial, though unknown, number of its laptops were missing. After several months, those officials settled upon a number of laptops believed to be missing, and filed both a police report and an insurance claim with [Continental]. CTSC claims that the laptops were stolen on March 10, 1998. In fact, as the deposition testimony abundantly indicates, CTSC officials have no idea when any of the computers were allegedly stolen, whether they were stolen on one day or over a period of time, or, for that matter, whether they were stolen at all. The only thing CTSC officials are sure of is that some of their laptops are missing. March 10, 1998 is a randomly chosen date; the laptops could have been missing months earlier. And as the depositions further indicate, CTSC officials do not know what happened to their computers because of the inadequacies of their inventory control system, for which they fired the purportedly responsible officials.

This is precisely the scenario excluded by the policy: failure to account for and secure one's assets. Accordingly, the laptop loss comes within the plain meaning of the policy language, and summary

cline to interpret the relevant definitions in this case.

judgment must be granted for [Continental].

J.A. at 32–34.

## II. DISCUSSION

We review de novo the district court's order granting summary judgment. *See Parry v. Mohawk Motors of Mich., Inc.,* 236 F.3d 299, 307 (6th Cir.2000), *cert. denied,* —— U.S. ——, 121 S.Ct. 2594, 150 L.Ed.2d 752 (2001). Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When reviewing a motion for summary judgment, we must draw all reasonable inferences in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Petrey v. City of Toledo,* 246 F.3d 548, 553 (6th Cir.2001). To prevail, the nonmovant must show sufficient evidence to create a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Because this case falls within our diversity jurisdiction, we apply the same law, including choice-of-law rules, that would be applied in the state courts. *See Kipin Indus., Inc. v. Van Deilen Int'l, Inc.,* 182 F.3d 490, 493 (6th Cir.1999); *Kurczi v. Eli Lilly & Co.,* 113 F.3d 1426, 1429 (6th Cir. 1997). The parties have not disputed that Michigan law applies in the present case, and thus we will assume, for purposes of this appeal, that Michigan law applies. Under Michigan law, the interpretation of insurance policies is "guided by a number of well-established principles of construction." *Mich. Millers Mut. Ins. Co. v. Bronson Plating Co.,* 445 Mich. 558, 519 N.W.2d 864, 868 (Mich.1994). "Foremost among those is the maxim that an insur-ance policy must be enforced in accordance with its terms. A court may not read ambiguities into a policy where none exist." *Id.* The Michigan Supreme Court recently reiterated that "the most fundamental principle of contract interpretation" is that "the court may not read ambiguity into a policy where none exists." *Farm Bureau Mut. Ins. Co. of Mich. v. Nikkel,* 460 Mich. 558, 596 N.W.2d 915, 920 (Mich. 1999). "Where ambiguity is found," however, "the court must construe the term in the manner most favorable to the insured." *Bronson Plating,* 519 N.W.2d at 869. Moreover, we have stated that, under Michigan law, "[a]n insurance policy is ambiguous if it is susceptible to two different reasonable interpretations." *Comerica Bank v. Lexington Ins. Co.,* 3 F.3d 939, 942 (6th Cir.1993).

The district court held that, based on the explicit terms of the insurance policy at issue, CTSC officials discovered through taking an inventory that they were missing laptop computers and thus that the loss was excluded from coverage. The policy language at issue states: "We will not pay for loss of or damage to .... [p]roperty that is missing, but there is no physical evidence to show what happened to it, such as shortage disclosed on taking inventory." J.A. at 326. Clearly, under this term CTSC's loss would be excluded from coverage if the fact that the computers were missing was discovered on CTSC's taking inventory. CTSC now disputes this conclusion, however, arguing that the fact that the laptops were missing was discovered before the count took place and that the actual count—even if it can be called an "inventory"—was "performed to determine the extent of loss." Appellant's Br. at 18. *See also* Appellant's Br. at 21 (disputing that the count in the case can be described as an "inventory").

In our view, however, the outcome of the present case does not turn on whether the

count is characterized as an "asset count" or an "inventory." Nor does the outcome depend on whether that count took place before or after CTSC employees discovered that laptops were missing from CTSC's Burlington facility. The language of the limitation bars CTSC's claim regardless of whether the count is called an inventory or when the counting began. The insurance policy language at issue is clear and unambiguous on this point: Continental is not obligated to pay claims for missing property when there is "no physical evidence to show what happened to it." To date, CTSC has produced no physical evidence to show what happened to the missing laptops. As the district court noted, CTSC officials do not know when the laptops were taken from the Burlington facility or by whom—indeed, CTSC's officers do not know what happened to the missing laptops, although their inference that the laptops were stolen appears to be the only reasonable one.[3]

On appeal, CTSC again argues that the term "physical evidence," which is not defined in the policy itself, is ambiguous. In making this argument, CTSC relies on two cases decided under New York law. We do not believe that the Michigan courts would find these cases persuasive, however. In the first of these cases, *McCormick & Co. v. Empire Ins. Group*, 878 F.2d 27

(2d Cir.1989), the Second Circuit decided that somewhat different policy language was ambiguous under New York law. New York's highest court, however, has subsequently commented that *McCormick*'s "holding is an inaccurate interpretation of New York State law." *Maurice Goldman & Sons, Inc. v. Hanover Ins. Co.*, 80 N.Y.2d 986, 592 N.Y.S.2d 645, 607 N.E.2d 792, 793 (N.Y.1992).

The second case on which CTSC relies is *Moneta Dev. Corp. v. Generali Ins. Co. of Trieste & Venice*, 212 A.D.2d 428, 622 N.Y.S.2d 930 (N.Y.App.Div.1995). The missing property in *Moneta* consisted of twenty-two tons (44,000 pounds) of heavy equipment that the insured's officer had seen in a given location on March 3, 1988, but which was missing from that location on March 9, 1988. *See id.* at 930. The insurer denied coverage under policy language identical to that at issue in this case: "We will not pay for loss of ... [p]roperty that is missing, but there is no physical evidence to show what happened to it, such as shortage disclosed on taking inventory." *Id.* at 931. The appellate division held that this language was "sufficiently ambiguous to compel its interpretation in plaintiff's favor." *Id.* The appellate division reasoned that, "[t]o hold otherwise would mean[] that even a theft which was actually observed by eyewitnesses, who watched

---

3. At oral argument, CTSC's counsel cited *Libralter Plastics, Inc. v. Chubb Group of Ins. Cos.*, 199 Mich.App. 482, 502 N.W.2d 742 (Mich.Ct.App.1993), in support of this inference. In *Libralter*, the Michigan appellate court reversed the granting of summary judgment to the insurer where the insurer had denied coverage of a loss on the basis of a "mysterious disappearance" exclusion. The *Libralter* court held that, on a motion for summary judgment, the insured had put forward sufficient facts to defeat summary judgment by proffering evidence that the insured property was missing. *See id.* at 745. *Libralter* does not govern our analysis of the present case, however, as it was based on different

policy language, i.e., the "mysterious disappearance" exclusion. This policy language led to a dispute of material fact regarding whether the disappearance was truly "mysterious" or whether it could be explained by less mysterious means, i.e., theft. In the present case, in contrast, the dispute is whether the policy language ("physical evidence") is ambiguous, a question of law. In addition, we note that the facts of the present case are distinguishable from those in *Libralter*, where the missing property consisted of two injection molds, each weighing 400 pounds, *see id.* at 744, rather than easily transported laptop computers.

as the thieves physically removed the property, would be excluded, merely because the thieves were skilled enough to leave no signs of forced entry behind them." *Id.*

We disagree with the *Moneta* court's conclusion that the term at issue is ambiguous. That a term may have undesirable consequences, such as those described in *Moneta*, does not make it ambiguous. Instead, as we have previously held, under Michigan law an ambiguous term is one "susceptible to two different reasonable interpretations." *Comerica*, 3 F.3d at 942. CTSC has not proffered a reasonable interpretation of "physical evidence" different from that advanced by Continental. Instead, relying on *Moneta*, CTSC argues that it "has demonstrated that it once possessed the laptops, that the laptops cannot be found, and that the laptops were removed without CTSC's consent." Appellant's Br. at 17. In other words, CTSC argues that its description of the laptops as "missing" is, in effect, "physical evidence" of what happened to them. But this interpretation of the exclusion term as a whole is not reasonable as it conflates "physical evidence" of theft with the mere fact that the property is "missing." Under this interpretation, there would always be "physical evidence" of what happened to missing property because the insured's mere description of the property as "missing," and presumed stolen, would count as "physical evidence" of what happened to it. This line of reasoning leads to the paradoxical conclusion that all missing property would be covered by the policy when there is no physical evidence of what happened to it, based on the "missing property" exclusion itself.[4]

Thus, the alternative interpretation of "physical evidence" advanced by CTSC in the present case would deprive the exclusion of any meaning whatsoever. In interpreting Michigan law, however, we are obligated to give the terms of the exclusion their plain meaning and to refuse to force ambiguities where none reasonably exist. *See, e.g., Heniser v. Frankenmuth Mut. Ins.*, 449 Mich. 155, 534 N.W.2d 502, 505 (Mich.1995) ("Terms in an insurance policy must be given their plain meaning and the court cannot create an ambiguity where none exists.") (quotation omitted); *Fresard v. Mich. Millers Mut. Ins. Co.*, 414 Mich. 686, 327 N.W.2d 286, 289 (Mich.1982) ("Ambiguities should not be forced."). CTSC has failed to demonstrate that "physical evidence" is susceptible of two different, but reasonable, interpretations. The drafters of the policy language in question clearly provided for the situation in which property is "missing," i.e., unaccounted for, but in which there is "no physical evidence" indicating what happened to it. Given that the language of the policy is unambiguous, summary judgment for Continental was appropriate. *See, e.g., Jones v. Farm Bureau Mut. Ins. Co.*, 172 Mich.App. 24, 431 N.W.2d 242, 244 (Mich.Ct.App.1988) ("Construction of an insurance contract containing unambiguous language is a question of law for the court.").[5]

---

4. In fairness to the *Moneta* court, we note that it reached this problematic conclusion based, in large part, on "the fact that a very large amount of heavy equipment disappeared in a short period of time." 622 N.Y.S.2d at 931. This reasoning is less persuasive in a case involving laptop computers, which are designed to be easily transported, and an undefined period of time in which the computers disappeared. *See also Libralter*, 502 N.W.2d at 744.

5. CTSC's other arguments against the plain meaning of the term at issue are without merit. It is not clear how the plain meaning of the term, for example, "creates an exception to coverage that swallows all-risk coverage, thus rendering the entire Policy illusory." Appellant's Br. at 17. The fact that an exclu-

In this appeal, CTSC also argues that the district court erred in dismissing its remaining claims for breach of the implied covenant of good faith and fair dealing, bad faith, and violation of the Michigan Uniform Trade Practices Act. Given that CTSC's claim was properly denied, Continental cannot be found liable for damages for breaching an implied covenant of good faith and fair dealing, bad faith, or for violating the Uniform Trade Practices Act, as none of these claims constitute independent causes of action under Michigan law. *See, e.g., Kewin v. Mass. Mut. Life Ins. Co.*, 409 Mich. 401, 295 N.W.2d 50, 56 (Mich.1980) (holding that "the mere bad-faith breach" of an insurance contract does not give rise to "an independent and separately actionable tort"); *City of Wakefield v. Globe Indem. Co.*, 246 Mich. 645, 225 N.W. 643, 644 (Mich.1929) ("[T]he insurer is liable to the insured for *an excess of judgment over the face of the policy* when the insurer ... in bad faith refuses to compromise a claim for an amount within the policy limit.") (emphasis added); *Norgan v. American Way Life Ins. Co.*, 188 Mich.App. 158, 469 N.W.2d 23, 26 (Mich. Ct.App.1991) (holding that insured-plaintiff may recover *interest* on claim under Michigan Uniform Trade Practices Act, M.C.L. § 500.2006, where insurer breached insurance contract and refused to pay claim, which was "reasonably in dispute"); *Wendt v. Auto Owners Ins. Co.*, 156 Mich. App. 19, 401 N.W.2d 375, 379 (Mich.Ct. App.1986) (holding that insurer's breach of implied duty of good faith may render insurer liable for *additional damages* where insurer breached insurance contract). Because CTSC is unable to show that Continental breached the terms of the policy, it cannot prevail on these claims, and summary judgment was appropriate.

## III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court.

---

sion applies in a given case does not "swallow[ ] all-risk coverage"—if it did, then "all-risk" policies would not include exclusions. *Cf. Atlantic Lines Ltd. v. American Motorists Ins. Co.*, 547 F.2d 11, 13 (2d Cir.1976) ("Carriers which do not wish to insure against this broad risk customarily incorporate an exclusionary clause in their policies exempting from coverage 'unexplained loss, mysterious disappearance or loss or shortage disclosed on taking inventory.'"). Nor does the fact that an exclusion applies in a particular instance render the whole insurance policy illusory.