REALCOMP II, LTD., Plaintiff,

v.

ACE AMERICAN INSURANCE CO., Defendant.

Case No. 12–cv–11280.

United States District Court, E.D. Michigan, Southern Division.

Signed Sept. 9, 2014.

Brian D. O'Keefe, Hyman Lippitt, Harvey R. Weingarden, Lippitt O'Keefe, PLLC, Birmingham, MI, James D. Wilson, Wilson Young, Detroit, MI, for Plaintiff.

Edward P. Gibbons, Kari A. Timm, Walker Wilcox Matousek, LLP, Chicago, IL, Thomas F. Myers, Garan Lucow, Detroit, MI, for Defendant.

## ORDER GRANTING ACE AMERICAN'S MOTION FOR SUMMARY JUDGMENT (document no. 16), DENYING REALCOMP'S MOTION FOR SUMMARY JUDGMENT (document no. 14), AND DISMISSING CASE

STEPHEN J. MURPHY, III, District Judge.

Realcomp II, Ltd., purchased a Professional Liability Insurance Policy from

ACE American Insurance Co., with effective dates of January 1, 2010 to January 1, 2011. During this period, Realcomp was named as a defendant in the civil action *Eugene Allan, et al. v. Realcomp II, Ltd., et al.*, No. 10–14046 (E.D.Mich.). Realcomp brought the current declaratory judgment action in diversity, alleging that ACE American is obligated under the insurance policy to defend Realcomp. ACE American responded by arguing that the case falls under one of the insurance policy's exclusion clauses, relieving it of the duty to defend. The parties cross-moved for summary judgment. The Court, having reviewed the papers, concludes that a hearing is not necessary to resolve the motions. *See* E.D. Mich. LR 7.1(f)(2). For the reasons stated below, the Court will grant ACE American's motion for summary judgment and dismiss the case.

## BACKGROUND

The plaintiff, Realcomp II, Ltd., is a corporation whose shareholders are comprised of associations and boards of realtors. Realcomp's customers subscribe to Realcomp's residential brokerage services, including access to a multiple-listing service ("MLS"), "a database of information about properties for sale ... that can be viewed and searched by all other local brokers who practice in the area and participate in the MLS." *Realcomp II, Ltd. v. FTC*, 635 F.3d 815, 820 (6th Cir.2011) (internal quotations and citations omitted). The database facilitates information sharing among brokers representing home buyers and sellers.

The dominant business model for a real estate broker working on behalf of a person selling a home is an Exclusive Right to Sell ("ERTS") contract. In that type of arrangement, the listing, or selling, broker is the exclusive sales agent for a certain period of time. If a home is sold within the time period, the listing broker collects a fee. The fee is usually split with a cooperating, or buying, broker, with whom the listing broker negotiates to complete the transaction. But the fee paid by the seller is independent of whether or not the listing agent finds a cooperating agent with whom to work. Therefore, if the home is sold to an unrepresented buyer, the listing agent still receives the entire agreed-upon fee.

Certain brokers saw the ERTS contract model as inefficient, and began proposing alternative models. One model is an Exclusive Agency ("EA") agreement. Under an EA contract, a broker agrees to take less or no compensation if a property is sold without further assistance from the listing broker. No fees are paid to a cooperating broker unless one is actually used. As a trade-off, certain services that are typically performed by listing brokers in ERTS deals are either not provided or are paid for on an as-needed basis by sellers. In addition to EA agreements, there are a number of other alternative fee systems, all falling under the general heading of "discount" brokerage arrangements, that place market pressure on the traditional ERTS model by cutting back on fees typically associated with selling a home. One can conceptualize the ERTS model as "full-service/bundled" arrangements, and non-traditional models such as the EA as "non full-service/unbundled" arrangements that present possible customers with varying services at generally lower prices.

On October 12, 2006, the Federal Trade Commission ("FTC") filed an administrative complaint against Realcomp. The FTC alleged that Realcomp discriminated in favor of brokers using ERTS arrangements over those offering EA and other discount contracts in violation of § 5 of the Federal Trade Commission Act. Section 5

tracks § 1 of the Sherman Act. 15 U.S.C. § 45; *see Realcomp II, Ltd.,* 635 F.3d at 824 ("[T]he same analysis applies to both violations of Section 1 of the Sherman Act and Section 5 of the FTC Act."). Realcomp allegedly created policies that prevented listings from being placed on feeds to publicly accessible websites unless they met certain "minimum services" criteria in their arrangements with home sellers. The requirements blocked discount brokers from appearing on the websites, since the essence of their business was offering fewer services than a broker in an ERTS arrangement. Choking off the flow of discount broker listings to the public had a serious impact on the business of discount brokers, which are dependent on attracting the attention of non-represented buyers and eliminating the "middleman" role played by other brokers to provide a lower price to their clients. The FTC ultimately found that Realcomp's rules constituted an illegal restraint of trade. *In re Realcomp II, Ltd.,* No. 9320, 2007 WL 6936319 (F.T.C. Oct. 30, 2009). And the Sixth Circuit affirmed under a full rule-of-reason analysis in *Realcomp II, Ltd.*

On May 14, 2007, a civil action was filed against Realcomp in the case of *Home Quarters Real Estate · Group, LLC v. Michigan Data Exchange, Inc., et al.,* No. 07–12090, in the Eastern District of Michigan. The plaintiff was the Home Quarters Real Estate Group, LLC ("Home Quarters"), a discount brokerage service, and the defendants were Michigan Data Exchange, Inc., and Realcomp. The complaint alleges that Michigan Data Exchange and Realcomp engaged in unlawful actions in restraint of trade by shutting out access by Home Quarters to the defendants' MLS data, and implementing new access policies that eventually put Home Quarters out of business. Compl. ¶ 20–27, *Home Quarters* (No. 07–12090).

The defendant, ACE American Insurance Co., is an insurance company that provides, among other things, liability insurance for covered associations such as Realcomp. ACE American issued Realcomp a Professional Liability Insurance Policy (the "Policy") from January 1, 2010 to January 1, 2011. The Policy is a renewal of prior policies of comparable coverage beginning January 1, 2008.

On October 8, 2010, the civil action *Eugene Allan, et al. v. Realcomp II Ltd., et al.,* No. 10–14046 (E.D.Mich.) (the "Underlying Action") was filed and based upon the same underlying set of circumstances as the FTC action. Allan and others alleged the Defendants engaged in a contract, combination, or conspiracy in restraint of trade or commerce under the Sherman Act.

On October 18, 2010, Western Wayne Oakland County Association of Realtors, on behalf of Realcomp, notified ACE American of the Underlying Action. Realcomp filed a claim to defend against the Underlying Action shortly thereafter, and ACE American subsequently denied Realcomp's claim by letter dated November 18, 2010. ACE American Nov. 18, 2010 Letter, Ex. B, ECF No. 14. Realcomp brought the instant declaratory judgment action on March 21, 2012. The parties have now cross-moved for summary judgment.

## STANDARD OF REVIEW

Summary judgment is warranted "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A dispute over material facts is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202

(1986). To show that a fact is, or is not, genuinely disputed, both parties are required to either "cite[] to particular parts of materials in the record" or "show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed.R.Civ.P. 56(c)(1). In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences in a light most favorable to the nonmoving party. *60 Ivy St. Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987).

## DISCUSSION

In their cross-motions for summary judgment, the parties agree that the case revolves around whether either of two exclusion clauses in the Policy apply to the Underlying Action. ACE American argues that either or both of Exclusion I or Exclusion R apply, relieving it of the duty to defend Realcomp; Realcomp argues neither apply.

### I. *Legal Standards*

 In Michigan, an insurance contract is treated and interpreted like any other written contract. *Comerica Bank v. Lexington Ins. Co.*, 3 F.3d 939, 942 (6th Cir.1993) (citing *Hall v. Equitable Life Assurance Society*, 295 Mich. 404, 295 N.W. 204 (1940)).[1] A court "must look at the contract as a whole and give meaning to all terms." *Fed.-Mogul U.S. Asbestos Pers. Injury Trust v. Cont'l Cas. Co.*, 666 F.3d 384, 390 (6th Cir.2011) (quoting *Auto–Owners Ins. Co. v. Churchman*, 440 Mich. 560, 566, 489 N.W.2d 431 (1992)). "Policy language in an insurance contract is to be given its ordinary meaning unless it is apparent from a reading of the whole instrument that a different or special meaning was intended." *Comerica Bank*, 3 F.3d at 942 (citing *Sump v. St. Paul Fire & Marine Ins. Co.*, 21 Mich.App. 160, 175 N.W.2d 44 (1970)).

 ■A court will "construe ambiguous terms in the light most favorable to the insured." *N. Am. Specialty Ins. Co. v. Myers*, 111 F.3d 1273, 1278 (6th Cir.1997) (citing *Advance Watch Co., Ltd. v. Kemper Nat'l. Ins. Co.*, 99 F.3d 795, 799 (6th Cir. 1996)). But a term or policy is considered ambiguous only "if it is susceptible to two different reasonable interpretations." *Comerica Bank*, 3 F.3d at 942 (citing *Arrigo's Fleet Service, Inc. v. Aetna Life and Casualty Co.*, 54 Mich.App. 482, 221 N.W.2d 206 (1974)). "The fact that a policy does not define a relevant term does not render the policy ambiguous." *Doeren Mayhew & Co., P.C. v. CPA Mut. Ins. Co. of Am. Risk Retention Grp.*, 633 F.Supp.2d 434, 440 (E.D.Mich.2007) (citing *Henderson v. State Farm Fire & Cas. Co.*, 460 Mich. 348, 354, 596 N.W.2d 190 (1999)). Instead, a court should "interpret the terms of the contract in accordance with their commonly used meanings." *Id.* (quoting *Henderson*, 460 Mich. at 354, 596 N.W.2d 190).

---

1. Realcomp is a Michigan corporation and ACE American is a Pennsylvania corporation. There is no choice of law provision in the Policy. As a federal court sitting in diversity, the Court applies the law of the forum in which it sits—here, Michigan. See *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir.2009) (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)). ACE American cites Michigan law in its summary judgment motion, and does not argue that under Michigan choice-of-law jurisprudence Pennsylvania law should control. Def's Mot. for Summ. J. 9 (citing *Trierweiler v. Frankenmuth Mut. Ins. Co.*, 216 Mich.App. 653, 656, 550 N.W.2d 577 (1996)), ECF No 16. The Court will apply Michigan law.

 "[I]nsurance exclusion clauses are construed strictly and narrowly." *Aetna Cas. & Sur. Co. v. Dow Chem. Co.*, 28 F.Supp.2d 440, 445 (E.D.Mich.1998) (citing *Auto–Owners Ins. Co.*, 440 Mich. at 567, 489 N.W.2d 431). Even so, "courts will enforce clear and unambiguous exclusions in insurance policies." *Tenneco Inc. v. Amerisure Mut. Ins. Co.*, 281 Mich.App. 429, 467, 761 N.W.2d 846 (2008).

## II. *Application of the Policy*

 The parties do not dispute that the Policy was in operation when the Underlying Action was filed, or that, absent the application of one of the exclusionary clauses, ACE American would have the duty to defend Realcomp under Section I.B.2 of the Policy. *See* Def's Mot. for Summ. J. at 10, 15. The parties only differ on whether Exclusion I and Exclusion R, as defined in Section IV.I and IV.R of the Policy, apply. After reviewing the Policy and the motions, the Court concludes that the Underlying Action falls under Exclusion R, relieving ACE American of the duty to defend.

## III. *Exclusion R*

ACE American argues that either of two prior events constitute prior litigation: the 2007 lawsuit filed against Realcomp, and the FTC proceeding.

Section IV.R of the Policy excludes:

Any claim based upon, arising out of, in consequence of, or in any way involving:

1. Any prior and/or pending litigation as of the inception of this insurance, or the effective date of the earliest Policy issued by the **Company** of which this Policy is a renewal, whichever is earlier; or

2. Any fact, circumstance, or situation underlying or alleged in such litigation;

Policy at 11.

Neither the Policy nor Exclusion R define a "fact, circumstance, or situation," or the term "underlying or alleged," with respect to what counts as prior litigation. Accordingly, the Court must interpret the terms "in accordance with their commonly used meanings." *Doeren Mayhew & Co., P.C.*, 633 F.Supp.2d at '440 (quoting *Henderson*, 460 Mich. at 354, 596 N.W.2d 190).[2]

 Although the terms and phrase "fact, circumstance, or situation" bears a resemblance to the legal principles of res judicata, claim preclusion, or issue preclusion, *see generally Milbrath v. Linsenbigler*, 2008 WL 4562261 at *2 n. 3 (W.D.Mich. Oct. 8, 2008) (defining "res judicata" as the general principle, "claim preclusion" for legal claims, and "issue preclusion" for findings of fact), the Policy does not define itself by reference to those legal concepts. While true that "insurance exclusion clauses are construed strictly and narrowly," *Aetna Cas. & Sur. Co.*, 28 F.Supp.2d at 445 (E.D.Mich.1998) (citing *Auto–Owners Ins. Co.*, 440 Mich. at 567, 489 N.W.2d 431), the Policy's language should be "given its ordinary and plain meaning, rather than a technical or strained construction." *Comerica Bank v. Lexington Ins. Co.*, 3 F.3d 939, 943–44 (6th Cir.1993) (citing *Jones v. Farm Bureau Mut. Ins. Co.*, 172 Mich.App. 24, 431 N.W.2d 242 (1988)). A court is "not at liberty to insert words which have been omitted, and which are not to be found in the instrument." *Id.* (quoting *Washington Cnty. Bank v. Jerome*, 8 Mich. 490, 491 (1860)).

---

**2.** While the parties contest the definition of "litigation" with respect to the FTC proceeding, the *Home Quarters* action is litigation under any common or legal definition.

Thus, while Realcomp attempts to distinguish *Home Quarters* by noting that it was brought "against separate and distinct individuals," Resp. to Def's Mot. for Summ. J.13, ECF No. 11, the distinction is ultimately irrelevant. Exclusion R only speaks of a "fact, circumstance, or situation underlying or alleged" in "prior and/or pending litigation." Nothing in the exclusion adds a requirement of an identity of parties or legal privity. *Cf. Buck v. Thomas M. Cooley Law Sch.*, 597 F.3d 812, 817 (6th Cir.2010) (requirements of res judicata include "actions involve the same parties or their privies") (quoting *Adair v. State,* 470 Mich. 105, 121, 680 N.W.2d 386 (2004)). And there is no requirement in the exclusion that joinder rules somehow apply. *Cf. id.* (res judicata encompasses "not only claims already litigated, but also every claim arising from the same transaction that the parties, exercising reasonable diligence, could have raised but did not."). There is no language that would restrict Exclusion R's application to parties or privies in the Underlying Action. *See generally Comerica Bank,* 3 F.3d at 944 ("[T]he district court correctly refused to insert the distinction between corporate and representative capacity which plaintiff was advocating, because the distinction was not to be found anywhere in the insurance policy.").

## IV. *Analysis*

■ The Home Quarters plaintiffs and the Underlying Action plaintiffs allege the same anticompetitive behavior by Realcomp—that Realcomp used policies, between 2004 and 2007, for access to its MLS and to web sites that discriminated against, and effectively excluded, any non-ERTS brokers in restraint of trade under the Sherman Antitrust Act. *See Home Quarters* Compl. ¶ 26–27, 37; Underlying Action Compl. ¶ 98–100, 137–41, 216–22.[3] True, the *Home Quarters* plaintiffs alleged damages based on Realcomp's action that shut down their business, whereas the Underlying Action plaintiffs here allege damages based on Realcomp's action that raised prices for brokerage services due to the stifling of competition. But both the *Home Quarters* plaintiffs and the Underlying Action plaintiffs allege the same wrongful anti-competitive behavior and action by Realcomp: the restriction of access and dissemination of MLS listings through policies limited to ERTS brokers, as discussed at length in the FTC opinion. Thus, the Court concludes that Realcomp's alleged anti-competitive behavior is the same "circumstance" or "situation" with respect to both lawsuits. *See* Webster's Third New International Dictionary, 2002 (defining "circumstance: the total complex of essential attributes and attendant adjuncts of a fact or action;" and "situation: position with respect to conditions and circumstances"); *see generally Comerica Bank,* 3 F.3d at 944 ("district court was within its discretion to take judicial notice of the dictionary definition of the word "arising" when interpreting contract) (citing *Poland v. Martin,* 761 F.2d 546 (9th Cir.1985)). Different plaintiffs certainly are making the allegations—but the action Realcomp is alleged to have taken is identical. The plaintiffs are merely making alternative claims for their own damages based on the same set of facts.[4]

---

**3.** The Underlying Action plaintiffs believed their action was based on "some of the transactions or occurrences alleged" in the *Home Quarters* lawsuit. *See* Underlying Action Compl. at 2, ECF No. 14–2.

**4.** To use a rough analogy: Assume that someone crashes a motor vehicle into a parking lot, injuring people, and damaging other people's cars. While one party may sue first for damage to a vehicle, a second party suing later for personal injury is unquestionably

Realcomp raises the following arguments against Exclusion R's applicability: the parties are distinct; the claims are separate and distinct; and the claims were not, or could not have been, brought by the *Home Quarters* plaintiffs. As discussed above, there is no privity or joinder requirement in Exclusion R. Realcomp makes no further argument to distinguish the claims, other than citing two cases for the proposition that "related claims" provisions in insurance contracts are narrowly construed: *Hrobuchak v. Federal Insurance Co.*, No. 10–481, 2010 WL 4237435 (M.D.Pa. Oct. 21, 2010), and *Lehigh Valley Health Network, et al. v. Executive Risk Indemnity Inc., et al.*, No. 1999–5916, 2001 WL 21505 (E.D.Pa. Jan. 10, 2001).

Both *Hrobuchak* and *Lehigh Valley Health Network* are inapplicable. First, both rely on Pennsylvania state law, which is not binding here. More specifically, in *Hrobuchak*, the defendant was a debt collection business being sued by multiple parties under the Fair Debt Collection Practices Act. The court there concluded that the mere fact that "all the suits allege that [defendant] is a debt-collection business that … run bad check diversionary programs and commit various abuses and wrongful acts in running these programs" did not mean all the suits alleged "the same" "series of facts, circumstances, situations, transactions or events." *Id.* at *4. Because the defendant's core business practice was administering bad check di-

version programs, to construe any lawsuit which challenged the core business would "vitiate the purpose of the policy." *Id.* Here, the parties are not alleging multiple acts that happen to take the same form. Rather, both the *Home Quarters* plaintiffs and the Underlying Action plaintiffs are alleging the *same* anticompetitive act—the implementation of policies restricting MLS access—that happened to occur over the span of several years and affect multiple parties.[5]

In *Lehigh Valley Health Network*, the court first held that, unlike here, the exclusionary clause at issue was ambiguous. 2001 WL 21505 at *8. More importantly, although admitting that there was a "modicum of overlap" between the suits at issue, the court concluded that the relationship was too tenuous to support exclusion. Citing a general rule that "related" claims "[do] not encompass every conceivable or logical relationship," and cannot be so "attenuated or unusual [an insurer] could not have expected that they would be treated as a single claim under the policy," *id.* at *8 (quoting *Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Ins. Co.*, 5 Cal.4th 854, 21 Cal.Rptr.2d 691, 855 P.2d 1263 (Cal.1993)), the court concluded the relationship between the facts of the two lawsuits was so tenuous that it precluded a finding. *Id.* at *9.[6] Moreover, the court agreed some form of privity was required,

bringing a claim "based on" the same "fact, circumstance, or situation" as the car crash in the first suit.

5. Of lesser distinction, the *Hrobuchak* court's declaration that because the two suits involved a "different time frame, different states, different state penal laws, different plaintiffs, and different arrangements with district attorneys," *id.* at *4; here, the parties allege the same time frame, same state, and same federal antitrust law.

6. The Court agrees there is some limit of "foreseeability" even without privity; although, for example, a death somehow stemming from Realcomp's anti-competitive behavior arises out of the same facts, it would likely be too attenuated. But here, as the alleged behavior is the same, and the alleged damages are directly linked to exclusion from the MLS, merely for different plaintiffs, the Court concludes that any question or test of "foreseeability" need not be answered.

which, as discussed above, is not part of the Policy here.

If "the terms of an insurance contract are clear as written ... they must be enforced as written." *Allstate Ins. Co. v. Freeman,* 432 Mich. 656, 665, 443 N.W.2d 734 (1989). The Court concludes there is no ambiguity to the words or phrase "fact, circumstance, or situation," and that because the *Home Quarters* action and Underlying Action allege the same anticompetitive behavior by Realcomp, the Underlying Action is "based upon" the same "fact, circumstance, or situation" alleged in the *Home Quarters* litigation.[7] Accordingly, Exclusion R applies to the Underlying Action, and ACE American is correspondingly relieved from its duty to defend Realcomp. The Court will therefore grant ACE American's motion for summary judgment, deny Realcomp's motion for summary judgment, and dismiss the case.

## ORDER

**WHEREFORE,** it is hereby **ORDERED** that ACE American's motion for summary judgment (document no. 16) is **GRANTED.** This case is **DISMISSED WITH PREJUDICE.**

**IT IS FURTHER ORDERED** that Realcomp's motion for summary judgment (document no. 14) is **DENIED.**

**SO ORDERED.**

---

[7]. Although the Court is not applying any estoppel or waiver theory, Realcomp acknowledged in the Underlying Action that the *Home Quarters* action was "challenging the very same policies at issue" in the Underlying Action. Mot. for J. on the Pleadings 20, *Realcomp* ECF No. 158.